Nos. 20-1415, 20-1416, 20-1919, 20-1920

IN THE

# United States Court of Appeals
# for the Federal Circuit

BASF PLANT SCIENCE, LP,

*Plaintiff-Appellant*,

v.

COMMONWEALTH SCIENTIFIC AND INDUSTRIAL RESEARCH ORGANISATION,

*Defendant-Cross Appellant*.

------------------------------------------------------------------------------------

COMMONWEALTH SCIENTIFIC AND INDUSTRIAL RESEARCH ORGANISATION,
GRAINS RESEARCH AND DEVELOPMENT CORPORATION, NUSEED PTY LTD.,

*Plaintiffs-Counterclaimants-Cross-Appellants*,

v.

BASF PLANT SCIENCE, LP, CARGILL, INC.,

*Defendants-Counterdefendants-Appellants*,

BASF PLANT SCIENCE, GMBH,

*Counter-Counterclaimant-Appellant*.

Appeal from the United States District Court for the Eastern District of Virginia
The Honorable Henry C. Morgan, Jr., Case No. 17-cv-503

## OPENING BRIEF OF BASF PLANT SCIENCE, LP, BASF PLANT SCIENCE, GMBH, AND CARGILL, INCORPORATED

*(Counsel listed on inside cover)*

December 21, 2020

Ahmed J. Davis
Daniel R. Gopenko
FISH & RICHARDSON P.C.
1000 Maine Avenue, S.W.
Suite 1000
Washington, D.C. 20024
(202) 783-5070

Christopher R. Dillon
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA  02210-1878
(617) 542-5070

Elizabeth M. Flanagan
FISH & RICHARDSON P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN  55402
(612) 335-5070

*Counsel for Appellant Cargill,
Incorporated*

Catherine E. Stetson
Anna Kurian Shaw
Reedy C. Swanson
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
cate.stetson@hoganlovells.com

Jason Leonard
Nitya Anand
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000

*Counsel for Appellants BASF Plant
Science, LP and BASF Plant Science,
GmbH*

## RELEVANT PATENT CLAIM LANGUAGE

## GROUP A

### U.S. Patent No. 9,951,357

Claim 1: A recombinant plant cell which synthesises eicosapentaenoic acid (EPA), comprising more than one hetereologous polynucleotide, wherein said polynucleotides encode:

a) a Δ6 desaturase, a Δ6 elongase and a Δ5 desaturase; or

b) a Δ5/Δ6 bifunctional desaturase and a Δ5/Δ6 bifunctional elongase; wherein the more than one polynucleotides are operably linked to one or more promoters that are capable of directing expression of said polynucleotides in the cell, wherein the enzymes encoded by said polynucleotides comprise at least one desaturase which is able to act on an acyl-CoA substrate, and wherein the synthesis of EPA requires the sequential action of said enzymes.

Claim 33: The cell of claim 32, wherein said cell is capable of synthesising DHA.

[Appx1403-1404]

### U.S. Patent No. 9,926,579

Claim 5: A process for producing DPA and DHA in an esterified form as part of triacylglycerols comprising

i) obtaining the *Brassica napus* seed of claim 4, and

ii) extracting triaglycerols from the seed.

[Appx1266]

### U.S. Patent No. 9,970,033

Claim 5: The *Brassica napus* plant seed of claim 3, further comprising an exogenous desaturase which desaturates an acyl-CoA substrate.

[Appx1894]

i

**U.S. Patent No. 9,994,880**

Claim 2: The recombinant nucleic acid molecule of claim 1, wherein the Δ5/Δ6 bifunctional desaturase catalyses desaturation of an acyl-CoA substrate.

Claim 10: The cell of claim 9, wherein the Δ4 desaturase is a *Pavlova* Δ4 desaturase.

[Appx2176]

**GROUP B**

**U.S. Patent No. 9,994,792**

Claim 4: A *Brassica napus* seed comprising the *Brassica napus* seed cell of claim 3.

[Appx2040]

**GROUP D**

**U.S. Patent No. 9,932,541**

Claim 20: The oil of claim 15, wherein at least 80% of the DHA esterified in the form of TAG is at the sn-1 or sn-3 position of the TAG.

[Appx2393]

**GROUP E**

**U.S. Patent No. 10,125,084**

Claim 1: *Brassica* sp. seedoil, comprising fatty acids in an esterified form, the fatty acids comprising oleic acid, palmitic acid, ω6 polyunsaturated fatty acids which comprise linoleic acid (LA), ω3 polyunsaturated fatty acids which comprise α-

linolenic acid (ALA), docosapentaenoic acid (DPA) and docosahexaenoic acid (DHA), and optionally one or more stearidonic acid (SDA), eicosapentaenoic acid (EPA), and eicosatetraenoic acid (ETA), wherein the level of palmitic acid in the total fatty acid content of the seedoil is between 2% and 16%, wherein the level of myristic acid (C14:0) in the total fatty acid content of the seedoil, if present, is less than 1%, wherein the level of DPA in the total fatty acid content of the seedoil is between 1% and 16%, wherein the level of DHA in the total fatty acid content of the seedoil is less than 2%, and wherein at least 70% of the EPA esterified in the form of triacyglycerols (TAG) in the seedoil is in the sn-1 or sn-3 position of the TAG.

[Appx2530]

# CERTIFICATE OF INTEREST

Counsel for BASF Plant Science, LP and BASF Plant Science, GmbH certifies the following:

1. Full name of party represented by me:

BASF Plant Science, LP and BASF Plant Science, GmbH

2. Name of real party in interest represented by me:

N/A

3. Parent corporations and publicly held companies that own 10% or more of stock in the party:

> BASF Plant Science, LP is a Delaware limited partnership.  Its general partner (with a 1% ownership interest) is BASF Corporation, a Delaware Corporation whose shares are not publicly traded.  BASF Corporation also holds an 89% limited partnership interest.  The remaining 10% limited partnership interest is held by BASF Plant Science GmbH, a German limited liability company.  No publicly held corporation holds a 10% or greater ownership interest in BASF Plant Science LP.

> BASF Plant Science GmbH is a German limited liability company.  It is a 100% subsidiary of BASF Plant Science Company GmbH, which is a 100% subsidiary of BASF SE.  In addition, the following are subsidiaries of BASF Plant Science GmbH: SunGene GmbH, Metanomics GmbH, CropDesign, Biocrates, and BASF Plant Science LP.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

> The following attorneys from Hogan Lovells US LLP appeared in the District Court on behalf of BASF Plant Science, LP and BASF Plant Science, GmbH: Arlene L. Chow; Christian E. Mammen; Emily Anne Gomes; Ernest Yakob; Jared Scott Schubert; Michael P. Doughtery; Takashi Okuda; Una Chiao-Yi Fan; N. Thomas Connally; Thomas B. Hunt

5. Related Cases.  Provide the case titles and numbers of any case known to be

pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b):

N/A

6. Organizational Victims and Bankruptcy Cases:

N/A

Dated: December 21, 2020          /s/ Catherine E. Stetson
                                  Catherine E. Stetson

                                  *Counsel for Appellants BASF Plant Science,
                                  LP and BASF Plant Science, GmbH*

# CERTIFICATE OF INTEREST

Counsel for Cargill, Incorporated certifies the following:

1. Full name of party represented by me:

Cargill, Incorporated

2. Name of real party in interest represented by me:

N/A

3. Parent corporations and publicly held companies that own 10% or more of stock in the party:

N/A

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

> Fish & Richardson P.C.: Michael Eugene Florey, Sarah Marianne Cork, Taylor Leigh Caldwell, Brianna Chamberlain, Dexter Jordan Starling Whitley
>
> Miles & Stockbridge PC: Carl Robert Schwertz; Jeffrey S. Poretz
>
> Greene Espel PLLP: Kathryn N. Hibbard; Robert J. Gilbertson; Sybil L. Dunlop

5. Related Cases. Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b):

N/A

6. Organizational Victims and Bankruptcy Cases:

N/A

Dated: December 21, 2020          <u>/s/ Ahmed J. Davis</u>
                                  Ahmed J. Davis

                                  *Counsel for Appellant Cargill, Incorporated*

# TABLE OF CONTENTS

Page

RELEVANT PATENT CLAIM LANGUAGE ...........................................................i

CERTIFICATES OF INTEREST .........................................................................iv

TABLE OF AUTHORITIES ................................................................................x

STATEMENT OF RELATED CASES ..................................................................xv

STATEMENT OF JURISDICTION .......................................................................2

INTRODUCTION ...............................................................................................2

STATEMENT OF THE ISSUES ............................................................................6

STATEMENT OF THE CASE ...............................................................................7

      A.    Omega-3 long-chain polyunsaturated fatty acids ...........................7

      B.    BASF and CSIRO pursue production of omega-3 fatty acids ..........................................................................................9

            1.    *BASF's early research in canola* .........................................10

            2.    *BASF's collaboration with CSIRO* ......................................11

            3.    *BASF's collaboration with Cargill* ......................................13

      C.    The parties' dispute and the patents-in-suit ..................................14

      D.    Procedural history ........................................................................17

SUMMARY OF THE ARGUMENT .....................................................................21

STANDARD OF REVIEW .................................................................................24

ARGUMENT ...................................................................................................26

I.    THE ASSERTED GROUP A CLAIMS ARE INVALID UNDER THE WRITTEN DESCRIPTION REQUIREMENT OF 35 U.S.C. § 112 ........................................................................26

# TABLE OF CONTENTS—Continued

Page

A. The Patent Specification Does Not Convey To A Person Of Ordinary Skill In The Art That The Inventors Possessed A *Canola* Crop Plant That Makes LC-PUFAs .............27

B. The Specification's Inclusion Of *Brassica* In A Series Of "Laundry Lists" Does Not Satisfy The Written Description Requirement ...............................................35

C. If Such A General Patent Specification Were Adequate, The Asserted Group A Claims Would Have Been Obvious Under 35 U.S.C. § 103 ....................................43

II. APPELLANTS CANNOT BE LIABLE FOR INFRINGEMENT AS A MATTER OF LAW BECAUSE BASF CO-OWNS THE ASSERTED PATENTS...................47

III. CARGILL SHOULD BE DISMISSED FROM THIS LITIGATION ........................................................56

CONCLUSION.....................................................59

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

Page(s)

CASES:

Akazawa v. Link New Tech. Int'l, Inc.,
    520 F.3d 1354 (Fed. Cir. 2008) ...................................................25, 47

Ariad Pharms., Inc. v. Eli Lilly & Co.,
    598 F.3d 1336 (Fed. Cir. 2010) ...................................................passim

Bd. of Trs. of Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.,
    583 F.3d 832 (Fed. Cir. 2009) ...........................................................47

Boston Sci. Corp. v. Johnson & Johnson,
    647 F.3d 1353 (Fed. Cir. 2011) ...........................................25, 43, 44

Brice v. Nkaru,
    220 F.3d 233 (4th Cir. 2000) .......................................................26, 48

Capon v. Eshhar,
    418 F.3d 1349 (Fed. Cir. 2005) .........................................................33

Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.,
    541 F.3d 1115 (Fed. Cir. 2008) .........................................................25

Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am. Inc.,
    492 F.3d 484 (4th Cir. 2007) .............................................................25

Centocor Ortho BioTech, Inc. v. Abbott Labs.,
    636 F.3d 1341 (Fed. Cir. 2011) .........................................................25

Enzo Biochem, Inc. v. Gen-Probe Inc.,
    323 F.3d 956 (Fed. Cir. 2002) .....................................................21, 31

Falko–Gunter Falkner v. Inglis,
    448 F.3d 1357 (Fed. Cir. 2006) .........................................................43

Fujikawa v. Wattanasin,
    93 F.3d 1559 (Fed. Cir. 1996) .....................................................37, 39

## TABLE OF AUTHORITIES—Continued

Page(s)

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
    318 F. Supp. 1116 (S.D.N.Y. 1970) ..................................21

*In re Cray Inc.*,
    871 F.3d 1355 (Fed. Cir. 2017) .......................................56

*In re Gosteli*,
    872 F.2d 1008 (Fed. Cir. 1989) .......................................35

*In re Herschler*,
    591 F.2d 693 (C.C.P.A. 1979) ............................43, 44, 45

*In re HTC Corp.*,
    889 F.3d 1349 (Fed. Cir. 2018) .................................24, 59

*In re Rasmussen*,
    650 F.2d 1212 (C.C.P.A. 1981) .......................................44

*In re Ruschig*,
    379 F.2d 990 (C.C.P.A. 1967) ...................................*passim*

*In re Smythe*,
    480 F.2d 1376 (C.C.P.A. 1973) .......................................33

*In re ZTE (USA) Inc.*,
    890 F.3d 1008 (Fed. Cir. 2018) .......................................57

*Lockwood v. Am. Airlines, Inc.*,
    107 F.3d 1565 (Fed. Cir. 1997) .......................................31

*Minnesota Mining & Mfg. Co. v. Eco Chem, Inc.*,
    757 F.2d 1256 (Fed. Cir. 1985) ............................57, 58, 59

*Novozymes A/S v. DuPont Nutrition Biosciences APS*,
    723 F.3d 1336 (Fed. Cir. 2013) ............................37, 38, 39

*Nuvo Pharms. (Ir.) Designated Activity Co. v. Dr. Reddy's Labs. Inc.*,
    923 F.3d 1368 (Fed. Cir. 2019) .......................................31

# TABLE OF AUTHORITIES—Continued

Page(s)

*Parkway 1046, LLC v. U.S. Home Corp.*,
  961 F.3d 301 (4th Cir. 2020) ............................................................26

*Pfaff v. Wells Elecs., Inc.*,
  525 U.S. 55 (1998)......................................................................4, 54

*PIN/NIP, Inc. v. Platte Chem. Co.*,
  304 F.3d 1235 (Fed. Cir. 2002) .......................................................25

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
  843 F.3d 1315 (Fed. Cir. 2016) .......................................................58

*Purdue Pharma L.P. v. Faulding Inc.*,
  230 F.3d 1320 (Fed. Cir. 2000) ....................................22, 37, 38, 40

*Regents of the Univ. of California v. Eli Lilly & Co.*,
  119 F.3d 1559 (Fed. Cir. 1997) ................................................33, 35

*Schriber-Schroth Co. v. Cleveland Tr. Co.*,
  305 U.S. 47 (1938)...........................................................................37

*Synthes USA, LLC v. Spinal Kinetics, Inc.*,
  734 F.3d 1332 (Fed. Cir. 2013) .......................................................33

*TC Heartland LLC v. Kraft Foods Group Brands LLC*,
  137 S. Ct. 1514 (2017)...................................................24, 56, 58, 59

*Thatcher v. Kohl's Dep't Stores, Inc.*,
  397 F.3d 1370 (Fed. Cir. 2005) ..................................................25, 47

*Therasense, Inc. v. Becton, Dickinson & Co.*,
  593 F.3d 1325 (Fed. Cir. 2010) .......................................................24

*Univ. of Rochester v. G.D. Searle & Co.*,
  358 F.3d 916 (Fed. Cir. 2004) .........................................................25

*Valeant Pharms. N. Am. LLC v. Mylan Pharms. Inc.*,
  978 F.3d 1374 (Fed. Cir. Nov. 5, 2020) ...............................26, 57, 59

# TABLE OF AUTHORITIES—Continued

Page(s)

STATUTES:

28 U.S.C. § 1295(a)(1) ...................................................................2

28 U.S.C. § 1331 ............................................................................2

28 U.S.C. § 1338(a) ........................................................................2

28 U.S.C. § 1400(b) ......................................................................56

28 U.S.C. § 2201 ............................................................................2

28 U.S.C. § 2202 ............................................................................2

35 U.S.C. § 103 ......................................................................43, 45

35 U.S.C. § 112 ......................................................................*passim*

35 U.S.C. § 112(a) ...................................................................5, 21

35 U.S.C. § 271(a) .................................................................47, 57

35 U.S.C. § 271(b) ........................................................................58

OTHER AUTHORITIES:

Frédéric Domergue, et al., *Acyl Carriers Used as Substrates by the
    Desaturases and Elongases Involved in Very Long-chain
    Polyunsaturated Fatty Acids Biosynthesis Reconstituted in Yeast*, 278
    J. Biological Chemistry 35115  (2003) ...............................................45

Frédéric Domergue, et al., In vivo *characterization of the first acyl-CoA
    $\Delta^6$-desaturase from a member of the plant kingdom, the microalga*
    Ostreococcus tauri, 389 Biochem J. 483 (2005) .................................11

Anthony J. Kinney, et al., *Production of Very Long Chain
    Polyunsaturated Fatty Acids in Oilseed Plants*, World Intell. Prop.
    Org., Int'l Pub. No. W02004/071467 (Aug. 26, 2004) .....................45

## TABLE OF AUTHORITIES—Continued

Page(s)

Olga V. Sayanova & Johnathan A. Napier, *Eicosapentaenoic acid:
    biosynthetic routes and the potential for synthesis in transgenic
    plants*, 65 Phytochemistry 147 (2004).................................................................45

*Subsist, v.*, Oxford English Dictionary (3d ed. 2012).............................................55

Guohai Wu, et al., *Stepwise engineering to produce high yields of very
    long-chain polyunsaturated fatty acids in plants*, 23 Nature
    Biotechnology 1013 (Aug. 2005) ......................................................................11

## STATEMENT OF RELATED CASES

There has been no prior appeal to the Federal Circuit or any other appellate court in this case.  There is no case known to counsel to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

IN THE

# United States Court of Appeals for the Federal Circuit

Nos. 20-1415, 20-1416, 20-1919, 20-1920

BASF PLANT SCIENCE, LP,

*Plaintiff-Appellant*,

v.

COMMONWEALTH SCIENTIFIC AND INDUSTRIAL RESEARCH ORGANISATION,

*Defendant-Cross Appellant*.

-------------------------------------------------------------------------------

COMMONWEALTH SCIENTIFIC AND INDUSTRIAL RESEARCH ORGANISATION, GRAINS RESEARCH AND DEVELOPMENT CORPORATION, NUSEED PTY LTD.,

*Plaintiffs-Counterclaimants-Cross-Appellants*,

v.

BASF PLANT SCIENCE, LP, CARGILL, INC.,

*Defendants-Counterdefendants-Appellants*,

BASF PLANT SCIENCE, GMBH,

*Counter-Counterclaimant-Appellant.*

Appeal from the United States District Court for the Eastern District of Virginia
The Honorable Henry C. Morgan, Jr., Case No. 17-cv-503

**OPENING BRIEF OF BASF PLANT SCIENCE, LP, BASF PLANT SCIENCE, GMBH, AND CARGILL, INCORPORATED**

## STATEMENT OF JURISDICTION

BASF Plant Science, LP, BASF Plant Science, GMBH (together, "BASF"), and Cargill, Incorporated ("Cargill") appeal from a final judgment of the U.S. District Court for the Eastern District of Virginia entered on September 3, 2020. Appx83. The District Court had subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202. Cargill disputes whether venue was proper as to Cargill. This Court has jurisdiction over the appeal under 28 U.S.C. § 1295(a)(1).

## INTRODUCTION

Omega-3 fatty acids are an essential part of the food chain. Two of these acids are vital to developing and maintaining human cardiovascular and neurological health, and promoting other important biological functions. These two acids work their way up from microalgae in the ocean, through fish like salmon, into the human diet. But with more of the fish we eat coming from fish farms lacking these natural sources of omega-3 fatty acids, it has become a priority to find a sustainable replacement.

Appellants BASF and Cargill did just that. After years of experimentation, BASF developed a way to genetically engineer canola, a large-scale crop plant, to produce seed oil that contains these essential acids. Cargill helped refine the product and boost its commercial potential.

Appellees—two research organizations sponsored by the Australian government and their commercial partner—had a similar goal. One of them, Australia's Commonwealth Scientific and Industrial Research Organisation (CSIRO), submitted a 2004 provisional patent application based on experiments it had conducted to generate these acids in *Arabidopsis*, a small plant commonly used in laboratory experimentation. CSIRO's 2004 application listed dozens of other plants, including commercial crop plants like canola, but it gave no examples showing that its method would actually work in any other plants. The omission of other working examples reflected CSIRO's research progress at the time: When it filed that 2004 application, and for several years thereafter, CSIRO was struggling to produce the relevant acids in canola or any other commercially-viable crop plant.

Frustrated, CSIRO reached out to BASF, which had established a name for itself in the area of canola engineering and had published articles in academic journals showing that it could produce omega-3 fatty acids in crop plants. In 2008, the two entities negotiated an agreement to conduct a joint evaluation involving combinations of their proprietary genes and processes to assess the most promising ways of generating the target acids in canola. That agreement specified that any intellectual property based on joint materials or results would be jointly owned by both parties.

The data CSIRO received from BASF, CSIRO concluded, was "extremely good value." CSIRO only managed to produce the target acids in canola in 2009, through the joint evaluation with BASF. After evaluation, the parties decided to continue their projects separately, and ultimately teamed up with the remaining parties to this case.

In May 2016, BASF's first patent application concerning the production of these acids in canola was published. CSIRO sprung into action: In the following months, it filed patent application after patent application targeted not at its own products, but at BASF and Cargill's—despite significant differences in the products' chemical profiles. And, for the key patents targeting BASF and Cargill's planned commercial products—which CSIRO knew from BASF's publicly available submissions—CSIRO claimed priority based on its 2004 patent application discussing the production of the target acids in *Arabidopsis*. In this litigation, Appellees successfully asserted a subset of the patents CSIRO obtained during this period.

In obtaining the patents in this case and asserting them against BASF and Cargill, CSIRO broke two bargains it made: one public and one private.

The public bargain is the one at the core of the patent system: An inventor obtains exclusive rights in an invention only by *disclosing* it to the public. *See Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 63 (1998). Thus, the patent's specification must

4

"contain a written description of the invention, and of the manner and process of making and using it," 35 U.S.C. § 112(a), that allows one skilled in the art "to recognize that the inventor invented what is claimed" and "had possession of the claimed subject matter as of the filing date," *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (internal quotation marks and brackets omitted).

Here, in relying on the specification from its 2004 application for a key group of patents in this case, CSIRO fell short of that obligation. That specification exclusively disclosed the production of the target acids in *Arabidopsis*. It mentioned other plants, including canola, solely in laundry lists of other plants. And it made no attempt to explain how the results achieved in the model plant could be achieved in the listed plants as well. Indeed, such an explanation would have been impossible. CSIRO had not achieved those results in the listed plants. CSIRO was able to obtain the target acids in canola only after CSIRO collaborated with BASF, many years *after* the 2004 application. And those laundry lists were so broad that they included plants that even CSIRO agrees *can never produce* the target acids. As a matter of law, such a specification fails to comply with the written description requirement at the heart of the patentee's bargain with the public.

The private bargain CSIRO broke was its contract with BASF. CSIRO's patents targeting BASF and Cargill's products are based on materials and

information that BASF supplied CSIRO under the plain terms of the 2008 joint evaluation agreement. Thus, to the extent CSIRO's patents are valid, BASF co-owns them. And BASF's status as a co-owner precludes this infringement action.

The science involved in this case can be complicated, but the law is not. A party cannot retrofit the scope of its patent rights by appending undisclosed claims to a decade-old specification concerning a different invention. Nor can it assert patents against a co-owner who made valuable contributions to the claimed inventions. In accord with these basic legal principles, the judgment of infringement against BASF and Cargill should be reversed. And even if it is not reversed, it should be vacated as to Cargill because the Court lacked venue over Cargill in the first place.

## STATEMENT OF THE ISSUES

1.    Whether the District Court erred in denying Appellants' motion for judgment as a matter of law (JMOL) that six claims across the challenged patents are invalid for lack of written description where the claims refer specifically to canola or broadly to any plant, but the patent specification focuses on a laboratory model plant and does not explain how results in the model plant can be achieved in the claimed plants.

2.    Whether the District Court erred in denying Appellants' JMOL motion that they cannot be held liable for infringement because BASF co-owns the patents Appellants were found to infringe.

3.     Whether the District Court erred in determining venue was proper as to Cargill.

## STATEMENT OF THE CASE

### A.     Omega-3 long-chain polyunsaturated fatty acids

Long-chain polyunsaturated fatty acids—called "LC-PUFAs"—are important for human health. *See* Appx8466-8467 (Zacharias). LC-PUFAs make up a large part of the brain and play a key role in infant brain development. Appx8467. They also appear to play a role in treating or preventing cancer, Alzheimers, heart disease, diabetes, and asthma. *Id.*

The two LC-PUFA molecules most relevant to this case are eicosapentaenoic acid (EPA), which has particular value for cardiovascular health, and docosahexaenoic acid (DHA), which has particular value for brain function and cognitive development. Appx8874 (Singh). Each has a carbon "backbone" consisting of 20 or more carbon atoms and multiple double bonds between various carbon atoms in the backbone: EPA has 20 carbons and five double bonds, and DHA has 22 carbons and six double bonds. *See* Appx8564, Appx8594 (Kunst). EPA and DHA are "omega-3" fatty acids because in each, the first of those double bonds occurs at the third carbon from the "omega" end—the carbon farthest from the head of the molecule. *See* Appx8565-8566 (Kunst).

7

Fish and fish oil are the most abundant sources of these essential fatty acids. Appx8467-8468 (Zacharias). In the wild, large fish like salmon eat a diet rich in LC-PUFAs produced by ocean microalgae and abundant in the smaller fish down the food chain. Appx8469 (Zacharias). But, today, over half the fish humans consume are raised in fish farms. Appx8471-8472, Appx8476-8477 (Zacharias). Those farm-raised fish need a source of LC-PUFAs to substitute for what would be available in their natural habitat. *Id.* Farmed fish usually are fed pellets containing LC-PUFAs obtained from other fish caught in the ocean, which can be quite costly. Appx8477 (Zacharias); Appx33. So as fish farming became more prevalent, and the fish pellets more expensive, a search for an alternative source of LC-PUFAs began. Appx8479-8480 (Zacharias). Attention turned to plants. Appx8482 (Zacharias).

Crop plants like canola contain short-chain fatty acids, but they do not produce the enzymes required to synthesize longer-chain fatty acids. *See* Appx8464 (Zacharias); Appx8252 (Kunst). Thus, they are incapable of naturally producing longer chain acids like EPA and DHA. *See* Appx8248, Appx8594 (Kunst); Appx9676-9677 (Zacharias).

Through genetic engineering, however, Appellants BASF and Cargill have modified certain crop plants—especially canola—to produce LC-PUFAs by introducing desaturases and elongases, the enzymes required for LC-PUFA production. *See* Appx9262 (Andre); Appx8482-8483 (Zacharias); Appx8570

8

(Kunst). Elongases extend the carbon chain by adding carbon atoms—two carbons to the starting acid's existing 18 to eventually get to EPA (20 carbons) and two more to eventually get to DHA (22 carbons). *See* Appx8570-8571, Appx8593-8594 (Kunst). Desaturases cause double bonds to form by removing hydrogen atoms from a precursor molecule. *See* Appx8571 (Kunst). To get to EPA, two additional double bonds must be created; for DHA, one further double bond is required. *Id.*

These desaturases and elongases naturally occur in, and can be extracted from, a variety of organisms such as microalgae, fungi, worms, fish, and even mammals. *See* Appx8586-8587 (Kunst). Appellants have used genetic modification methods to introduce these foreign desaturases and elongases from non-plant organisms into transgenic crop plants. *See* Appx9282-9283 (Andre); Appx8954 (Singh).

This genetic modification is facilitated by "vectors"—large nucleic acid molecules created by genetic engineers to encode the non-native enzyme. *See* Appx9322 (Andre); Appx10085-10086 (Kunst). Selecting the appropriate vector and foreign enzymes to produce a functional transgenic plant is unpredictable—and often unsuccessful. *See* Appx9301 (Andre).

## B. BASF and CSIRO pursue production of omega-3 fatty acids

The parties in this case include two entities who attempted to obtain LC-PUFAs from crop plants: BASF, a worldwide chemical company, and CSIRO, a research arm of the Australian government that does not directly produce or market

9

any transgenic crop plants. *See* Appx8352, Appx8496 (Zacharias). BASF succeeded. CSIRO did not—until it worked with BASF.

### 1. *BASF's early research in canola*

BASF was one of the earliest and most successful entrants into this field. Appx33-34. BASF succeeded in part because it "began working directly with canola . . . early in the process." Appx34. By 2002, BASF was able to produce EPA in the seeds of crop plants similar to canola; by 2004, it had done the same with DHA. *See* Appx9281-9282 (Andre), Appx14467; Appx9494, Appx9497 (Bauer), Appx12688. BASF had decided to pursue production of LC-PUFAs in canola by at least January 2006. *See* Appx9504-9505 (Bauer); Appx14511.

CSIRO pursued a "different strateg[y]." Appx34. Instead of working with a commercial crop plant, CSIRO's initial research, in 2004, focused on a small flowering plant known as *Arabidopsis*, which is often used as a laboratory research tool. *Id.*; Appx8953 (Singh). CSIRO attempted to produce LC-PUFAs in *Arabidopsis* through "enzymes extracted from zebrafish." Appx34. That approach presented several practical problems. For one thing, *Arabidopsis* is not a crop plant capable of producing LC-PUFAs at scale. Appx9088 (Singh); Appx10077 (Kunst). For another, Australia "prohibit[ed] the commercialization of a plant-based product which contained enzymes obtained from animals." Appx34. CSIRO therefore could not move forward with its research based on animal genes. In order for the project

to have any commercial utility, CSIRO instead had to find a way to produce LC-PUFAs through microalgae genes in a crop plant.  Appx8914, Appx8916 (Singh).

### 2.    *BASF's collaboration with CSIRO*

In 2003, CSIRO began looking for a research partner to help it navigate these practical difficulties.  *See* Appx8908 (Singh); Appx8806 (Adler).  And in 2005, CSIRO zeroed in on BASF.  Appx9123 (Adler); Appx9514-9515 (Bauer).

BASF's publications at that time showed that it was performing research in crop plants—and that it was already working with microalgae.  In particular, BASF had published an article in *Nature Biotechnology* showing that it had produced DHA in the crop plant *Brassica juncea*, Appx9287-9288 (Andre); Appx12688,[1] and an article in the *Journal of Biochemistry* showing that it had funded research discovering a particular enzyme known as delta-6 ($\Delta$6) desaturase in microalgae, Appx9296-Appx9267, Appx9268 (Andre); Appx12607.[2]  BASF's publication regarding *Brassica juncea* was particularly significant because *Brassica juncea* is "compatible" with canola: When pollen from one plant is introduced to the other, the plant will produce seeds.  Appx9291 (Andre); *see also* Appx9497 (Bauer) ("So

---

[1] Guohai Wu, et al., *Stepwise engineering to produce high yields of very long-chain polyunsaturated fatty acids in plants*, 23 Nature Biotechnology 1013 (Aug. 2005), *see* Appx12687-12692.

[2] Frédéric Domergue, et al., In vivo *characterization of the first acyl-CoA $\Delta^6$-desaturase from a member of the plant kingdom, the microalga* Ostreococcus tauri, 389 Biochem J. 483 (2005), *see* Appx12607-12614.

*Brassica juncea* and canola, *Brassica napus*, are very closely related to each other. It's kind of like sisters."). By contrast, *Arabidopsis* is "incompatible" with canola; the two plants cannot be crossed. Appx9291 (Andre). BASF's demonstrated ability to produce DHA in *Brassica juncea* therefore showed that BASF was further along in developing a cheap and sustainable source of LC-PUFAs in crop plants. *See* Appx9291-9292 (Andre).

BASF had collaborated with several other research organizations in the past. Appx9509-9514 (Bauer). Indeed, BASF's publication in the *Journal of Biochemistry* regarding the Δ6 desaturase in microalgae was the product of a collaboration with the University of Hamburg. Appx9296 (Andre). Those collaborations had frequently resulted in publications, co-owned patents, and licenses. Appx9509 (Bauer). But although the value *to CSIRO* in collaborating with BASF was obvious, BASF originally did not believe there was much reciprocal value for it to collaborate with CSIRO. Appx9515, Appx9517 (Bauer). After all, CSIRO had no data in canola, and by the time CSIRO and BASF formally met to discuss collaboration in 2007, BASF had been producing EPA and DHA in canola for years. *See supra* p. 11; Appx9517, Appx9518, Appx9521 (Bauer). But because CSIRO had some potentially interesting genes to share, Appx9515 (Bauer), BASF ultimately entered into a "Materials Transfer and Evaluation Agreement" (MTEA) with CSIRO. Appx12664-12686.

The 2008 MTEA specified that each party would provide certain materials and information that each party had developed in their separate research efforts. Appx12681. It also contained a provision assigning joint ownership of certain intellectual property that grew out of the collaboration. Appx12669-12670. Specifically, it provided that patents and other "[i]ntellectual [p]roperty subsisting in" constructs containing both BASF and CSIRO genes, or information derived from the evaluation described in the agreement, would belong jointly to both parties "immediately upon creation." *Id.*

CSIRO was very pleased with the information it received from BASF under the MTEA. Dr. Surinder Singh, one of CSIRO's "lead inventor[s]," Appx38, wrote at the time that "[t]he amount of data sent over by BASF was substantial and we feel it has been extremely good value to have done the joint evaluation with them." Appx13586. Quite so: CSIRO was unable to obtain *any* LC-PUFAs from canola "until 2009, during its collaboration with BASF." Appx34.

### 3.    *BASF's collaboration with Cargill*

The MTEA expired by its own terms after two years, and the former research collaborators looked elsewhere for commercial allies. Appx35. "CSIRO partnered with another Australian government entity," GRDC, "and a private Australian company," Nuseed. Appx34. BASF teamed with Cargill, which brought a number of valuable technical and marketing contributions to the table. Appx35.

13

Each group proceeded to develop seeds for canola plants that would yield dietary supplements for fish containing LC-PUFAs and eventually would be commercialized. Appx42, Appx44. BASF developed a genetically engineered LC-PUFA-producing seed line known as "LFK," which it submitted to the U.S. Department of Agriculture for regulatory approval. Appx47. Starting with BASF's genetically engineered LFK seed line, Cargill has through extensive crop breeding added favorable characteristics, such as increased yield and increased LC-PUFA content, to create a commercial seed oil known as "Latitude." *See* Appx45-47; Appx9615, Appx9620, Appx9625 (Horton).

Separately, working with CSIRO, Nuseed has developed a proposed commercial product called "Aquaterra." Appx50. The two commercial products "are not completely interchangeable," Appx51; Latitude "is a more EPA-dominated product," while Aquaterra "is more DHA-dominant," Appx50 (internal quotation marks omitted). "There is a need in the aquaculture market for Cargill's EPA-dominant Latitude product that cannot be met by Nuseed's DHA-dominant Aquaterra product." Appx51.

### C.  The parties' dispute and the patents-in-suit

BASF filed numerous patent applications related to its pioneering work in this field. To support its patent application process, BASF deposited seeds with the American Type Culture Collection (ATCC) in November 2014 and August 2015.

14

Appx13208-13213.  BASF's first publication concerning the LFK regulatory line, a patent application, was published in May 2016.  Appx9328 (Andre).

A few months later, CSIRO launched a flurry of its own patent applications. *See* Appx9333 (Andre).  It then sent BASF a letter listing CSIRO's patents and applications "in the omega-3 area."  Appx14366-14367.  In response, BASF filed suit seeking a declaration that the patents CSIRO identified in its letter were invalid. *See* Appx35.[3]  None of those patents remains in dispute today.  But after BASF filed suit, CSIRO submitted yet another wave of patent applications.  The parties amended their pleadings to include these later-issued patents.

The seven patents ultimately presented to the jury all grew out of applications filed *after* BASF submitted its May 2016 filing concerning its regulatory line, and *after* a Nuseed consultant obtained samples of the BASF seed deposits from the ATCC.  Appx9310 (Andre).  *None* of the patents covers any of Nuseed's commercial products; they were written to cover BASF and Cargill's regulatory and commercial seed lines.  Appx9672-9673 (Murphy); *see also* Appx46-47.  For ease of reference, the patents were sorted into four distinct groups at the district court:

---

[3] The case was initially filed in the District of Delaware, which dismissed the case without prejudice.  *See* Appx35-36.  The case was refiled in the Eastern District of Virginia in September 2017.  Appx36.

**Group A** consists of four asserted patents focusing on a "blueprint" for obtaining LC-PUFAs through a pathway involving Δ6 desaturase. Appx45.[4] The LFK and Latitude seed lines practice the relevant claims of the Group A patents. *See id.*

The Group A patents issued in 2018. But despite filing dates ranging from September 2016 to July 2017, CSIRO styled all of the Group A patents as "continuations" of a provisional application CSIRO filed in 2004—12-plus years earlier. *See* Appx35; Appx11107-11337. Consistent with CSIRO's focus at that time, the shared specification from the 2004 application focuses exclusively on the production of LC-PUFAs in *Arabidopsis*. *See* Appx9660-9661 (Murphy). Canola is mentioned in the specification—in "huge list[s]" with dozens of other plants from completely different plant families. Appx9661 (Murphy); Appx144. The specification does not explain the link—if any—between the numerous plants listed and what the patent teaches regarding the research model *Arabidopsis*. Appx9661 (Murphy).

By the end of trial, the remaining patent groups each consisted of a single patent: **Group B** is U.S. Patent Number 9,994,792, issued in 2018. Like the Group A patents, it claims a pathway to producing LC-PUFAs through a Δ6 desaturase,

---

[4] They are: U.S. Patent Nos. 9,926,579; 9,951,357; 9,970,033; and 9,994,880. Group A included additional patents; these four were the only Group A patents asserted at trial.

Appx8666-8667 (Kunst), and covers the regulatory and commercial lines, Appx8667 (Kunst).

**Group D** is U.S. Patent Number 9,932,541, issued in 2017; and **Group E** is U.S. Patent Number 10,125,084, issued in 2018.[5]  Both patents cover profiles of particular oils obtained through the genetic engineering techniques involved in this case.  Appx8668, Appx8673 (Kunst).  Group D covers only the LFK line used for regulatory clearance, Appx47; Group E covers the LFK line and the Latitude oil commercial product line, Appx8673 (Kunst).

### D.    Procedural history

BASF filed this suit seeking a declaratory judgment that certain patents targeting its inventions were invalid, not infringed, and unenforceable.  *See* Appx36.  CSIRO, GRDC, and Nuseed counterclaimed for infringement, adding additional patents, almost all of which they obtained after BASF filed its original complaint.  BASF countered the counterclaims, asserting an ownership interest in the patents under the MTEA—to the extent the patents were valid.  *Id.*[6]

---

[5] Appellees dropped the Group C patent during trial.

[6] Given these complicated alignments, the District Court referred to CSIRO, GRDC, and Nuseed as the "Proponents" of the patents and BASF and Cargill as the "Opponents."  Appx36-37.  This brief refers to the Opponents as "Appellants" and the Proponents as "Appellees."

17

CSIRO's counterclaim also sought to add Cargill as a counterdefendant. Appx2899-2978. Cargill is a Delaware corporation with its principal place of business in Minnesota. Appx3637. None of Cargill's work for Latitude took place in Virginia. Appx3638; *see also* Appx9451-9452 (Christiansen). The counterclaim does not allege that Cargill infringed the patents in Virginia. Nor could it: the experimental canola crops are grown in Montana; the oil from the canola seeds is crushed in North Dakota; and the future market for the Latitude oil is fish farms in Chile. Appx3611-3612; Appx9437, Appx9450-9451 (Christiansen); Appx10737 (Gromov). At the time of trial, Cargill did not even have regulatory permission to make or sell Latitude in the United States. Appx9450 (Christiansen). Cargill accordingly moved to dismiss for improper venue. Appx3598-3600.

The District Court denied the motion, concluding that it had personal jurisdiction over Cargill because Cargill was allegedly a business partner of BASF and that venue was proper as to Cargill because BASF's submission of seeds to the ATCC in support of its patent applications was allegedly an act of infringement that could be imputed to Cargill. Appx6889-6895.

Thereafter, the case proceeded apace through discovery. After winnowing, the trial narrowed to focus on certain claims in the Group A, B, D, and E patents identified above. The District Court bifurcated the trial into a liability phase and a remedies phase. The liability phase was tried before a jury.

As the patents were specifically prosecuted to cover their products, BASF and Cargill stipulated that they satisfied every limitation of the asserted claims in the Group A, B, and E patents; they did not stipulate to practicing the asserted claim of the Group D patent. Appx24. The primary trial contest therefore centered on validity and ownership of the patents.

With respect to validity, BASF and Cargill challenged the asserted claims of the Group A patents on written description grounds. They explained that the shared specification of the patents in this case focuses on only *Arabidopsis*, mentioning canola only as part of "a laundry list" of numerous other plants that might someday generate LC-PUFAs with further study. Appx10453-10454. That speculative disclosure, Appellants continued, would not show that "in 2004" CSIRO "actually possessed the full scope of the invention." Appx10454. And if the overly general specification *did* adequately describe the invention in all plants (as opposed to just in *Arabidopsis*), then the patents were obvious; as of the April 22, 2004 filing date, a person of ordinary skill in the art would have been motivated with a reasonable expectation of success to combine various pieces of prior art to arrive at the claimed invention.

As for ownership, BASF and Cargill argued that they could not be held responsible for infringement even if the asserted patents were all valid and non-obvious, because under the terms of the MTEA, BASF co-owns the asserted patents.

Each patent rests on BASF genes, or data and information concerning BASF genes, which BASF shared with CSIRO under the MTEA.

The jury returned its verdict on liability largely in favor of Appellees. Appx24; Appx10484. The jury determined that the asserted claims of the Group A and B patents satisfied the written description requirement, but that the asserted Group E patent claim did not. Appx26. And it found that, under the terms of the MTEA, BASF co-owned the Group B patent. Despite the often-overlapping subject matter of the patents, however, the jury reached the opposite conclusion on co-ownership with respect to the other patents. *See* Appx27.[7]

Appellants sought judgment as a matter of law on the issues of written description and ownership. *See* Appx8148, Appx8180 (Rule 50(a) motions); Appx14754 (Rule 50(b) motion). Appellees cross-moved for judgment as a matter of law, seeking to revive their claims based on the Group B and E patents. *See* Appx14810. The District Court denied both motions. *See* Appx137.

The remedies phase was tried to the bench. Appellees sought an injunction or a court-ordered royalty rate of anywhere from 12.4 to 49.1% of any gross sales of Latitude. *See* Appx58. But as the District Court observed, this case involved an "unusual situation": There have not yet been *any* commercial sales by either side,

---

[7] The jury also found the asserted Group D patent claim infringed by the regulatory LFK line, but not by Cargill's commercial line, Latitude. Appx24.

"no commercialization of the claims" by the Appellees, and "little evidence [the Appellees] are prepared to go to market in the foreseeable future." Appx57.

The Court therefore denied the request for an injunction. *See id.* Instead, after considering the evidence and applying the relevant factors in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), the Court awarded, as a remedy for the infringement of the Group A patents, 3.5% of the gross sales of Latitude for the life of the Group A patents and a one-time, lump sum, up-front payment of $3.705 million. Appx75. For the Group D infringement, the Court awarded 3.5% of the gross sales, if any occur, of the LFK line for the life of the Group D patent. *Id.*

These cross-appeals followed.

## SUMMARY OF THE ARGUMENT

I. To satisfy the written description requirement in 35 U.S.C. § 112(a), a patentee must explain how to "make and use" the invention, as well as "convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention." *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 969 (Fed. Cir. 2002) (internal quotation marks omitted). As a matter of law, that requirement cannot be satisfied by a specification that discloses only "myriads of possibilities" with "no guide indicating or directing that th[e] particular selection" in the claimed invention "should be made." *In re Ruschig*, 379 F.2d 990,

995 (C.C.P.A. 1967). In other words, "one cannot disclose a forest in the original application, and then later pick a tree out of the forest and say here is my invention." *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1326-1327 (Fed. Cir. 2000).

The asserted Group A patent claims concern a pathway for producing LC-PUFAs either in canola, or broadly in all plants. But those patents claim priority from a 2004 provisional application that does not satisfy the written description requirement with respect to the claimed inventions. The 2004 specification describes the process of producing LC-PUFAs exclusively in a laboratory model plant, *Arabidopsis*. The only mention of canola—or any other plant—is in three lengthy laundry lists of other plants that might someday be modified to produce LC-PUFAs. This "forest" worth of plants does not guide one skilled in the art to the invention in any plant other than *Arabidopsis*.

The specification's deficiency is not surprising. As of 2004, and for many years thereafter, CSIRO had not been able to achieve LC-PUFAs in canola or other crop plants. CSIRO's witnesses repeatedly conceded as much, and the fact is well documented in contemporaneous reports and investment plans. Nor was CSIRO sure that the claimed pathway would work: The field is one riddled with uncertainty, and the project met with substantial skepticism even within CSIRO at the time.

Nor can CSIRO cure its written description problem by falling back on general skill in the art. Doing so would render the patents obvious: The general principles

22

in the specification were already well known in the art by the 2004 filing date.  If all that is missing from those principles are additional techniques known to one skilled in the art, then the patents are obvious.

II. Even if the patents are valid, Appellants cannot be held liable for infringement.  A party cannot infringe a patent that it owns, and by the plain terms of the 2008 MTEA between BASF and CSIRO, BASF co-owns all the remaining asserted patents.

The MTEA provides for joint ownership, "immediately upon creation,"  in "Intellectual Property subsisting in" three categories of property: "Joint New Materials," "Joint Transformed Lines," and "Joint Results."  Appx12669-12670. The patents at issue in this case subsist in both Joint New Materials, defined as "constructs contain[ing] both CSIRO and [BASF] genes," or Joint Results, broadly defined as "all results, data or information derived from" "the program[] of work to be carried out under [the MTEA]" "with respect to Joint Transformed Lines and Joint New Materials."  Appx12666.

The claims of the '579 and '033 patents, both in Group A, incorporate enzymes that the MTEA specifies as belonging to BASF.  The remaining Group A patents likewise incorporate "very specific combinations of genes . . . that BASF used in its [LFK regulatory line]," Appx46, and reflect results and data from the experiments that BASF conducted as part of the MTEA.  The Group D and E patents,

23

likewise, reflect data and results of particular experiments that BASF conducted through the MTEA's joint evaluation. BASF therefore co-owns each of these patents, precluding this infringement action. The District Court reached a contrary conclusion only by focusing on issues that are legally irrelevant to the ownership issue under the MTEA.

III. The district court lacked venue over Cargill under *TC Heartland LLC v. Kraft Foods Group Brands LLC*, 137 S. Ct. 1514, 1517 (2017). Cargill is a Delaware corporation with its principal place of business in Minnesota, so it does not reside in Virginia. Moreover, it has not committed any acts of infringement in Virginia sufficient to confer venue under the patent venue statute. The district court's sole basis for concluding otherwise—that Cargill supposedly partnered with BASF in the submission of seed samples to the ATCC in Virginia in support of BASF's patent applications—is legally and factually flawed. Under proper application of governing law to the facts in this case, it is clear venue does not lie as to Cargill in Virginia, so the judgment entered against it should be vacated. *See In re HTC Corp.*, 889 F.3d 1349, 1353 (Fed. Cir. 2018).

## STANDARD OF REVIEW

This Court reviews the district court's grant of JMOL under regional circuit law. *Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1330 (Fed. Cir. 2010). The Fourth Circuit reviews post-verdict JMOL rulings *de novo*, examining

whether there is substantial evidence to support the judgment when viewed in the light most favorable to the appellee. *Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am. Inc.*, 492 F.3d 484, 488 (4th Cir. 2007).

1.      A determination that a patent is invalid for failure to meet the written description requirement of 35 U.S.C. § 112 is a question of fact, and this Court reviews the jury's determinations of fact for substantial evidence. *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1243 (Fed. Cir. 2002). But because the written description must be assessed based on the subject matter within "the four corners of the specification," *Ariad*, 598 F.3d at 1351, this issue is routinely decided at the summary judgment stage or on motions for JMOL following a jury verdict. *See, e.g.*, *id.* at 1358 (JMOL); *Centocor Ortho BioTech, Inc. v. Abbott Labs.*, 636 F.3d 1341, 1353 (Fed. Cir. 2011) (same); *Boston Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1367-69 (Fed. Cir. 2011) (summary judgment); *Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*, 541 F.3d 1115, 1128 (Fed. Cir. 2008) (same); *Univ. of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 929 (Fed. Cir. 2004) (same).

2.      This Court determines ownership of a patent based on underlying property law. *See Akazawa v. Link New Tech. Int'l, Inc.*, 520 F.3d 1354, 1357 (Fed. Cir. 2008). In this case, a contract governs the parties' respective ownership interests. The meaning of contractual language is a legal issue reviewed de novo. *See Thatcher v. Kohl's Dep't Stores, Inc.*, 397 F.3d 1370, 1374 (Fed. Cir. 2005);

*Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 312 (4th Cir. 2020). Any

subsidiary factual issues are reviewed, following Fourth Circuit practice, "viewing

the evidence in the light most favorable to the prevailing party." *Brice v. Nkaru*, 220

F.3d 233, 237 (4th Cir. 2000).

      3.     Whether venue is proper in patent cases is reviewed on appeal de novo,

and is governed by Federal Circuit law. *See Valeant Pharms. N. Am. LLC v. Mylan*

*Pharms. Inc.*, 978 F.3d 1374, 1381 (Fed. Cir. 2020).

## ARGUMENT

## I.    THE ASSERTED GROUP A CLAIMS ARE INVALID UNDER THE WRITTEN DESCRIPTION REQUIREMENT OF 35 U.S.C. § 112.

"[B]asic research cannot be patented" "no matter how groundbreaking or

necessary to the later patentable inventions of others." *Ariad*, 598 F.3d at 1353.

Therefore, claims are invalid under § 112 where the specification indicates that the

inventor merely disclosed a laundry-list research plan—that is, where "the myriads

of possibilities encompassed by the broad disclosure [provide] no guide indicating

or directing that this particular selection should be made rather than any of the many

others which could also be made." *In re Ruschig*, 379 F.2d at 995.

      BASF and Cargill challenged the asserted Group A claims as invalid for lack

of description, for this very reason. The specification for each patent describes the

process for producing LC-PUFAs exclusively in *Arabidopsis*, referring to other

26

plants—including canola—only in laundry lists of other plants that CSIRO might research in the future. But the asserted Group A claims are not limited to the specification's disclosure of *Arabidopsis*. Instead, they are directed to canola, or broadly to any plant, producing LC-PUFAs using the claimed pathway. The specification therefore does not guide one skilled in the art to the invention in every plant other than *Arabidopsis*, or in canola in particular.

CSIRO responded at trial by constructing an alternative view of the law where one looks at the later-claimed subject matter and, armed with that knowledge, works backwards to find support for the claims among the specification's laundry-list research plans. This is precisely what the written description requirement is supposed to prevent: inventors filing broad and abstract written descriptions, coupled with extensive lists of future research possibilities, with no evidence or teaching of the entire invention. The District Court's decision denying Appellants' JMOL motion on this ground conflicts with § 112, the precedent interpreting the statute, and the underlying policy the statute is supposed to advance.

### A. The Patent Specification Does Not Convey To A Person Of Ordinary Skill In The Art That The Inventors Possessed A *Canola* Crop Plant That Makes LC-PUFAs.

1. The asserted Group A claims pertain either specifically to canola or broadly to any plant at all. But in the 139-page, 218-column specification pertaining to the Group A patents, there are no working examples—none—relating to

27

production of LC-PUFAs in any plant besides the laboratory model *Arabidopsis*. Appx9661 (Murphy); Appx10185 (Kunst); Appx9997-9999, Appx10000 (Singh); Appx9660-9661 (Murphy).

*Arabidopsis* is not an adequate stand-in for all plants. And it is not an adequate stand-in for canola. *See* Appx9035, Appx9036, Appx9088 (Singh); Appx9273, Appx9274, Appx9276-9277 (Andre); Appx9641-9642, Appx9651-9652 (Murphy); Appx10077 (Kunst). Canola is a commercial crop plant. *See* Appx9651-9652 (Murphy). *Arabidopsis* is a weed used as an academic model plant because of its small size and fast growth. *Id.* Canola can grow to be six feet high; you can fit 30 to 40 *Arabidopsis* plants in a foot-long laboratory tray. *Id.* Canola can take between six to twelve months to grow; *Arabidopsis* takes between six and eight weeks. Appx9652 (Murphy).

At trial, Dr. Singh maintained that *Arabidopsis* and canola are similar because they are in the same general taxonomic family called *Brassicaceae*. Appx8955 (Singh). That is like saying a trade paperback and the *Oxford English Dictionary* are in the same family; as Dr. Singh admitted on cross-examination, the *Brassicaceae* family broadly includes *over four thousand* different plants, encompassing many non-oilseed plants such as broccoli, cabbage, radishes, arugula, cauliflower, and Brussels sprouts. Appx9035-9036 (Singh). Indeed, although

28

*Arabidopsis* and canola are from the same broad family, they are "incompatible"; cross-pollinating the two plants will not produce viable seeds.  Appx9291 (Andre).

Even setting aside their obvious physical differences, *Arabidopsis* and canola differ in ways that are critically important to the patent specification here.  First, they differ with respect to the amount and type of oil they produce.  *Arabidopsis* seeds, unlike canola seeds, have only "a very small amount of oil."  Appx9651 (Murphy); Appx10077 (Kunst).  Moreover, their fatty acid composition differs.  *Arabidopsis* is comprised of roughly equal parts of oleic, linoleic, and erucic acid; canola seeds are 60-85% oleic acid.  *See* Appx9651-9654 (Murphy); Appx9275, Appx9276-9277 (Andre).

*Arabidopsis* and canola also differ with respect to their genetics, requiring drastically different methods for developing new transgenic plants.  Appx9654-9657 (Murphy); *see also* Appx9278 (Andre).  Genetic modifications to *Arabidopsis* can be made via "the floral dip method," which involves "dipping your plant into a solution," and then "grow[ing]" the plant to "get seeds from it" which "will contain the new DNA, the new genes, the new construct."  Appx9655 (Murphy).  This method is so simple that it "can be done by, like, a lab intern, undergraduate"; "[i]t doesn't require any special skills."  *Id*.  Genetic modifications to the canola plant, by contrast, can be made only through a long, complex process requiring "very skilled lab personnel" who can "grow plants using tissue culture," "add hormones"

to the plant multiple times through a process called "regeneration," and then successfully transfer the plants to a greenhouse. Appx9655-9656 (Murphy).

In light of these significant differences, the specification's disclosure of data pertaining only to *Arabidopsis* is insufficient to provide a written description of the claimed invention either in canola specifically or broadly to any plant. Take, for example, just one of the differences described above—the differing fatty acid composition of the oil found in the seeds of non-modified *Arabidopsis* and canola. *Arabidopsis* and canola have differing quantities of oleic acid, which is the starting point of the Δ6 desaturase pathway. *See* Appx9654 (Murphy). *Arabidopsis* has significantly more oleic acid. *Id*. The asserted Group A claims each use the Δ6 desaturase pathway to convert oleic acid into long-chain polyunsaturated fatty acids in a plant. Appx9658 (Murphy). Consequently, the differing starting fatty acid profiles of *Arabidopsis* and canola affect how each plant can be modified to create significant quantities of long-chain polyunsaturated fatty acids. *See* Appx9652-9653 (Murphy); *see Ariad*, 598 F.3d at 1358 (reversing denial of JMOL motion and holding invalid, for lack of written description, claims where the disclosure contained "no working or even prophetic examples of methods that" accomplished the claims).

2.    "[T]he purpose of the 'written description' requirement is broader than to merely explain how to 'make and use'; the applicant must also convey with

reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention." *Enzo Biochem*, 323 F.3d at 969 (internal quotation marks omitted).  "One shows that one is 'in possession' of the invention by describing the invention, with all its claimed limitations . . . ." *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1571-72 (Fed. Cir. 1997).  For that reason, trial testimony regarding when the inventor actually possessed the claimed invention is highly relevant to the question whether the specification falls short of the written description requirement.

"[I]nventor testimony cannot establish written description support where none exists in the four corners of the specification . . . ." *Nuvo Pharms. (Ir.) Designated Activity Co. v. Dr. Reddy's Labs. Inc.*, 923 F.3d 1368, 1381 (Fed. Cir. 2019).  But that same inventor testimony *can* "illuminate[] the *absence* of critical description." *Id.* (emphasis added).  In that circumstance, the inventor's testimony can show that the specification "does not demonstrate that the inventor possessed more than a mere wish or hope that [the claimed invention] would work, and thus it does not demonstrate that he actually invented what he claimed." *Id*.  Thus, for example, where an "inventor's . . . own testimony at trial" showed "he only had a 'general concept'" of the claimed invention at the time he filed his patent application, this Court has held that the specification was fatally flawed. *Id*.

CSIRO's own witnesses admitted the inventors were not able to obtain LC-PUFAs in canola until more than five years *after* the 2004 priority date of the Group A patents—and then only *after* collaborating with BASF, who had already done it and shared that knowledge with CSIRO. CSIRO's lead inventor, Dr. Singh, testified that CSIRO was unable to achieve any omega-3 LC-PUFAs in canola until 2009, at least five years after the specification for the Group A Patents was filed. *See, e.g.*, Appx9029-9030 (Singh); *see also* Appx9091, Appx9092-9093, Appx10024 (Singh). He further admitted that "proof of concept"—meaning a successful extraction of LC-PUFAs from canola—still was not achieved, even as of May 2009. Appx10022 (Singh). CSIRO's expert, Dr. Kunst, likewise confirmed that "it took years" after CSIRO's initial data in *Arabidopsis* to produce LC-PUFAs in canola. Appx8807 (Kunst).

Contemporaneous CSIRO documents further demonstrated that the inventors did not possess their claimed invention in canola until more than five years after the specification for the Group A Patents was filed. For example, a 2009 Progress Report from Dr. Singh to GRDC states that CSIRO's "first generation construct [in canola] did not detect any presence of any LC-PUFA," and that CSIRO was finally able to achieve LC-PUFAs in canola in its second generation constructs only after its collaboration with BASF. *See* Appx12308. Similarly, a 2009 analysis from CSIRO identifies as a "weakness[]" of the LC-PUFA project that CSIRO had not

32

yet achieved "[p]roof of concept" in "target crop" canola. *See* Appx13615.

Likewise, a GRDC investment plan from 2010 states that "[i]t is expected that proof-of-concept for the production of omega-3 LC-PUFAs in canola will be achieved by project end at *30 June 2010*"—that is, *six years* after the filing of the Group A specification. Appx13484 (emphasis added).

3.     The unpredictability of the field underscores that a disclosure of data in *Arabidopsis* is insufficient to provide a written description of the claimed invention in canola, much less all plants. As this Court has explained, "in the 'unpredictable' fields of science, it is appropriate to recognize the variability in the science in determining the scope of the coverage to which the inventor is entitled." *Capon v. Eshhar*, 418 F.3d 1349, 1358 (Fed. Cir. 2005). This is "particularly" true "where there is unpredictability in performance of certain species or subcombinations other than those specifically enumerated." *Regents of the Univ. of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1568 (Fed. Cir. 1997) (quoting *In re Smythe*, 480 F.2d 1376, 1383 (C.C.P.A. 1973)). In that case, "disclosure of more species is necessary to adequately show possession of the entire genus." *Synthes USA, LLC v. Spinal Kinetics, Inc.*, 734 F.3d 1332, 1344–45 (Fed. Cir. 2013) (internal quotation marks omitted); *see also Ariad*, 598 F.3d at 1352-53 (stating that the written description problem "is particularly acute in the biological arts" and "when a patent claims a

genus by its function or result, the specification [must] recite[] sufficient materials to accomplish that function").

At trial, CSIRO's own witnesses repeatedly testified that the relevant field was unpredictable when CSIRO began its research. For example, as Dr. Singh explained, "[t]here were plenty of skeptic[s] within CSIRO" because "this was quite an ambitious project" involving "a highly unstable molecule." Appx8891 (Singh). As "one particular senior CSIRO scientist" pointed out, first, the "seed has very poor oxygen environment," which makes it difficult "to use the delta-6 desaturase aerobic pathway," and second, "even if" you are able to solve that problem, "this is such a highly unstable fatty acid that that seed is not going to be viable; you'll have a dead seed on your hand." Appx8892 (Singh).

Likewise, years after CSIRO's 2004 patent filing, investor and fellow Australian government agency GRDC still viewed CSIRO's undemonstrated ability to actually obtain LC-PUFAs from canola as a significant risk for GRDC's investment in the project. For example, a CSIRO investment analysis from 2007— three years after the relevant specification was filed—identified as a "Key Risk" the fact that the "[t]echnology does not work in appropriate oil seed, only works in *Arabidopsis*." Appx13479; *see also, e.g.*, Appx13484 (investment plan referring to June 30, 2010). In such an unpredictable field, a person of ordinary skill in the art would not have appreciated that the inventors possessed the claimed invention in

canola specifically, or in all plants broadly, based solely on data from *Arabidopsis*. Appx9664-9665 (Murphy).

The jury had even stronger evidence of unpredictability here—and most of that evidence came directly from CSIRO. *See supra* pp. 33-34. Consequently, disclosure of data in *Arabidopsis* was insufficient—as a matter of law—to provide a written description of the claimed invention in canola or any other plant that was not *Arabidopsis*. *See, e.g.*, *Regents of the Univ. of California*, 119 F.3d at 1569 (genus not described where "a representative number of cDNAs, defined by nucleotide sequence, falling within the scope of the genus" had not been provided); *In re Gosteli*, 872 F.2d 1008, 1012 (Fed. Cir. 1989) (two chemical compounds were insufficient description of subgenus).

> ### B. The Specification's Inclusion Of *Brassica* In A Series Of "Laundry Lists" Does Not Satisfy The Written Description Requirement.

1. The *only* disclosure of canola—or any plant other than *Arabidopsis*—in the specification is in three lengthy lists of essentially every plant, ranging from alfalfa to pineapples, that could theoretically be transformed in an attempt to produce LC-PUFAs. *See* Appx9661 (Murphy); *see also* Appx10185 (Kunst). The first list broadly names 35 different plants, including plants that are not oilseed plants, but that have oil in their fruit, like olives and coconuts. *See* Appx9661-9662 (Murphy):

> The plants of the invention may be: corn (*Zea mays*), canola (*Brassica napus*, *Brassica rapa* ssp.), flax (*Linum usitatissimum*), alfalfa (*Medicago sativa*),

rice (*Oryza sativa*), rye (*Secale cerale*), sorghum (*Sorghum bicolour*, *Sorghum vulgare*), sunflower (*Helianthus annus*), wheat (*Tritium aestivum*), soybean (*Glycine max*), tobacco (*Nicotiana tabacum*), potato (*Solarium tuberosum*), peanuts (*Arachis hypogaea*), cotton (*Gossypium hirsutum*), sweet potato (*Lopmoea batatus*), cassava (*Manihot esculenta*), coffee (*Cofea* spp.), coconut (*Cocos nucifera*), pineapple (*Anana comosus*), citris tree (*Citrus* spp.), cocoa (*Theobroma cacao*), tea (*Camellia senensis*), banana (*Musa* spp.), avocado (*Persea americana*), fig (*Ficus casica*), guava (*Psidium guajava*), mango (*Mangifer indica*), olive (*Olea europaea*), papaya (*Carica papaya*), cashew (*Anacardium occidentale*), macadamia (*Macadamia intergrifolia*), almond (*Prunus amygdalus*), sugar beets (*Beta vulgaris*), oats, or barley.

Appx1315 at col. 39:66-40:16.

The second list names at least twenty-eight plants, approximately half of which are new from the prior list. Appx1315 at col. 40:17-30. The list includes "lettuce, which doesn't even make oil," Appx9664 (Murphy), and several catch-all terms like "vegetable brassicas" and "nut producing plants," Appx1315 at col. 40:17-30.

The last list discloses 15 different plants described as the "preferabl[e]" plants of the invention:

Preferably, the seed is derived from an oilseed plant. More preferably, the oilseed plant is oilseed rape (*Brassica napus*), maize (*Zea mays*), sunflower (*Helianthus annuus*), soybean (*Glycine max*), sorghum (*Sorghum bicolor*), flax (*Linum usitatissimum*), sugar (*Saccharum officinarum*), beet (B*eta vulgaris*), cotton (*Gossypium hirsutum*), peanut (*Arachis hypogaea*), poppy (*Papaver somniferum*), mustard (*Sinapis alba*), castor bean (*Ricinus communis*), sesame (*Sesamum indicum*), or safflower (*Carthamus tinctorius*).

Appx1301 at col. 11:6-14. Despite beginning with the statement that "[p]referably, the seed is derived from an oilseed plant," *id.*, the list includes plants like sorghum and beets that are not oilseed plants. *See* Appx9725 (Murphy).

This type of "laundry list" disclosure—with no data or explanation linking the plants listed to the model plant actually described in the specification—cannot satisfy the written description requirement. It has been settled law for decades that where claims are based on patents filed later in time and targeted at another entity's product, the written description in the original application must provide sufficient detail to identify and describe the inventions later claimed. *See, e.g.*, *Schriber-Schroth Co. v. Cleveland Tr. Co.*, 305 U.S. 47, 57-59 (1938); *Ruschig*, 379 F.2d at 994-995; *Fujikawa v. Wattanasin*, 93 F.3d 1559, 1570 (Fed. Cir. 1996); *Ariad*, 598 F.3d at 1348; *Novozymes A/S v. DuPont Nutrition Biosciences APS*, 723 F.3d 1336, 1348 (Fed. Cir. 2013). This problem is particularly acute where the specification discloses a laundry list of possibilities without any guidance about which particular embodiments should be made. *See, e.g.*, *Purdue Pharma*, 230 F.3d at 1323.

For example, in *Novozymes*, this Court held that "generalized guidance" in the original patent specification to alter amino acids in an enzyme to provide "increased thermostability" did not provide sufficient written description for a later-added claim to an enzyme variant with a specific alteration (at amino acid position 239) having increased thermostability. 723 F.3d at 1346, 1348-49. Although the specification

mentioned alterations at amino acid position 239, this Court found insufficient support for the claims because the specification "nowhere describes the actual functioning, thermostable" enzyme variant recited in the later-added claim, *id*. at 1349, "nor [was] there anything to suggest that Novozymes actually possessed such a variant at the time of filing," *id.* at 1348. At most, this Court explained, Novozyme's specification "*only predicted* that at least some mutations at position 239 would yield variants with increased thermostability, *not that it possessed* or had definitively identified any mutations that would do so." *Id.* at 1350 (emphases added).

The written description requirement required more:  It "required Novozymes to confirm its predictions by actually making and testing [the] individual variants or at least identifying subclasses of variants that could be expected to possess the claimed properties." *Id.*  Because the application did not "disclose[] the [variants]" to the person of ordinary skill in the art, "specifically as something [Novozymes] *actually invented*," the patent lacked written description for the claims. *Id.* at 1350 (emphasis added) (quoting *In re Ruschig*, 379 F.2d at 995).

The specification at issue here similarly describes mere predictions, not possession.  The extensive lists of plants that CSIRO claimed, in the initial specification, might follow the *Arabidopsis* model did not show that CSIRO actually could produce results in any of those plants.  The specification "nowhere describes

38

the actual functioning" of the invention in canola or any other non-*Arabidopsis* plant. *Id.* at 1349. And for that reason, CSIRO cannot, in its later claims, merely point to canola's inclusion in those initial lists to claim that it possessed the invention in canola at the relevant time. This Court has repeatedly held that such a post-hoc reconstruction of a claim cannot support written description as a matter of law. *See, e.g.*, *id.* (written description cannot be established with hindsight reconstruction using disclosures "plucked selectively" from the specification); *Fujikawa*, 93 F.3d at 1571 ("Although, in hindsight, the substitution of cyclopropyl for isopropyl might seem simple and foreseeable, [the] disclosure provides no indication that position R would be a better candidate for substitution than any other."); *Ruschig*, 379 F.2d at 995 (similar).

Indeed, the claims here present an even stronger case for reversal than those in *Novozymes* because the list includes many plants for which the invention admittedly *cannot* work. The specification's examples are directed toward the production of DHA in oil derived from the seeds of *Arabidopsis*, *see* Appx9660-9665 (Murphy), but many of the listed plants are not oilseed plants, *see* Appx1301 at col. 11:6-14; Appx9725 (Murphy). And the testimony at trial showed that "you wouldn't even think about making [DHA and EPA] in these plants, like lettuce, which doesn't even make oil." Appx9664 (Murphy); *see also, e.g.*, Appx10080 (Kunst). Nor did the specification teach the impossible; there is no explanation of

how the invention could be replicated in non-oilseed plants. *See* Appx9664 (Murphy).

As this Court summarized in *Purdue Pharma*,

[O]ne cannot disclose a forest in the original application, and then later pick a tree out of the forest and say here is my invention. In order to satisfy the written description requirement, the blaze marks directing the skilled artisan to that tree must be in the originally filed disclosure.

230 F.3d at 1326-27. The lists here do nothing to "direct" a person of ordinary skill in the art to canola. *Id*. at 1326. The specification discloses a vast ecosystem's worth of plants, of which canola happens to be one. To say that the specification meets the written description requirement is a quintessential "overreach[]." *Id*. at 1327; *see also Ruschig*, 379 F.2d at 994 ("Specific claims to single compounds require reasonably specific supporting disclosure and . . . something more than the disclosure of a class of 1000, or 100, or even 48, compounds is required.").

2.    Appellees will doubtless point out that the third laundry list names canola as one of 15 different "preferable" plants. Appx1301 at col. 11:6-14. But that designation cannot meet the written description requirement for at least three reasons.

First, that list is so long and varied that it renders the notion of a "preferabl[e]" plant meaningless. Appx9661 (Murphy). "More preferabl[e]" plants include everything from sunflowers to beets. Appx1301 at col. 11:6-14.

Second, to the extent that the term "preferable" has any meaning here, it means only that the inventors "preferred" that the invention might someday work in those plants *because each is a crop plant*. Appx1301 at col. 11:6-14. The patent application contains no data or discussion as to whether or how LC-PUFAs could be made in any of these "preferred" plants. Possession of the invention in *Arabidopsis* is not, by itself, useful at any scale because "Arabidopsis is actually a weed plant. It's very small. . . . [T]here's no way you could commercially get oil from that to sell on the market." Appx9651 (Murphy). Possession of the invention in a crop plant used for the commercial production of oil, by contrast, would enable the cheap production of farmed fish that are equally healthy as wild fish. *See* Appx8471-8472, Appx8476-8477 (Zacharias); Appx9262, Appx9277-9278 (Andre). As the specification itself explains, "[a]n *important goal* in plant biotechnology is . . . the engineering of crop plants, particularly oilseed crops, that produce substantial quantities of LC-PUFA, thus providing an alternative source of these compounds," that is "sustainable." Appx1296 at col. 2:32-35, Appx1297 at col. 3:58-61 (emphasis added).

In other words, the specification uses the term "preferable" to mean "an important goal," not a prized possession. And a specification that lists 15 "preferable" commercial crop plants, but that lacks data linking those commercial crop plants listed to the laboratory model plant actually described in the

41

specification, is not explaining an invention that the inventor already possesses.  It merely offers a starting place to begin research.  And "basic research cannot be patented" "no matter how groundbreaking or necessary to the later patentable inventions of others." *Ariad*, 598 F.3d at 1353.

Third, even if "preferable" meant something more than "an important goal" here, the statement that these plants are "preferable" is not an adequate substitute for data linking the many plants listed to the model plant actually described in the specification—particularly where the specification states that "preferable" plants would be "oilseed plants," and yet the list of "preferable" plants includes plants that are not oilseed plants.  *See* Appx1301 at col. 11:6-14; *see also* Appx9725 (Murphy).  A person of ordinary skill in the art would not understand from that "preferable" list how the specification's examples, which are directed toward the production of DHA in oil derived from the seeds of *Arabidopsis*, would translate to the production of DHA in the non-oilseed plants.  *See* Appx9660-9665 (Murphy).  Simply put, for a "preferable" list to support written description of a claim where a larger list does not, it must illustrate the missing "blaze" marks.  *See supra* p. 40.  This list does no such thing.

The claimed inventions are a canola plant or, more broadly, any plant that makes EPA and DHA—not an invitation to experiment with various different plants to discover which plants may produce LC-PUFAs.  A person of ordinary skill in the

art would not understand from that "preferable" list how the inventors could grow *a canola plant that makes EPA and DHA.  Id.*  And, in fact, when the inventors first filed, they could not.  Appx9517, Appx9518, Appx9521 (Bauer).  The mere mention of canola in a laundry list of dozens of possible plants does not satisfy the written description requirement as a matter of law.

### C.    If Such A General Patent Specification Were Adequate, The Asserted Group A Claims Would Have Been Obvious Under 35 U.S.C. § 103.

If the District Court's denial of JMOL on the written description requirement was correct—meaning that the Group A patents satisfy the written description requirement through general references to the Δ6 pathway paired with examples directed exclusively to *Arabidopsis*—then Appellees run into a second problem: The patents are obvious.  *See* 35 U.S.C. § 103.

As this Court has often remarked, "[b]ecause the specification is viewed from the perspective of one of skill, in some circumstances, a patentee may rely on information that is 'well-known in the art' for purposes of meeting the written description requirement."  *Boston Sci.*, 647 F.3d at 1366 (quoting *Falko–Gunter Falkner v. Inglis*, 448 F.3d 1357, 1366-68 (Fed. Cir. 2006)).  For example, in *In re Herschler*, 591 F.2d 693 (C.C.P.A. 1979), this Court's predecessor applied that principle to hold that claims drawn to a new use of dimethyl sulfoxide (DMSO) with a broad class of steroidal agents were supported by a specification that disclosed

43

only a single steroid example falling within the claims. In considering whether this one example was sufficient written description to support a claim using DMSO to increase the skin penetration of a "physiologically active steroidal agent," *id*. at 695, 700, the court explained that "[i]t is not necessary that the application describe the claim limitations exactly, but only so clearly that one having ordinary skill in the pertinent art would recognize from the disclosure that appellants invented processes including those limitations." *Id*. at 701. And "steroids, when considered as a class of compounds carried through a layer of skin by DMSO, appear on this record to be chemically quite similar," such that "one having ordinary skill in this art would have found the use of the subgenus of steroids to be apparent in the written description." *Id*.

The fact that an inventor must describe "the invention," not the prior art, 35 U.S.C. § 112, of course, means that the converse is also true: "Because the specification is viewed from the perspective of one of skill," *Boston Sci.*, 647 F.3d at 1366, skilled artisans' understanding of what is obvious under that prior art is relevant to whether the specification provides adequate description of the claimed invention. *See In re Rasmussen*, 650 F.2d 1212, 1214 (C.C.P.A. 1981) ("An applicant is entitled to claims as broad as the *prior art* and his *disclosure* will allow." (emphases added)). If a written description is so broad that it discloses only what a skilled artisan already knows based on the prior art, and yet claims novel applications

of that knowledge—which a skilled artisan would not know how to achieve based on the prior art or based on the examples in the specification—then the written description is inadequate. *See Herschler*, 591 F.2d at 701 ("Were this application drawn to *novel* 'steroidal agents,' a different question would be posed." (emphasis added)). Obviousness under § 103, in this sense, serves as an outer limit on § 112's written description requirement.

Here, the evidence at trial showed that—if the written description of the Group A patents was adequate—the asserted Group A claims were obvious. *See, e.g.*, Appx9676-9677 (Murphy), Appx10206-10207 (Kunst). The Group A claims focus on the production of EPA and DHA in any plant through a Δ6 LC-PUFA synthesis pathway. And as three pieces of prior art revealed,[8] the claimed Δ6 LC-PUFA synthesis pathway, as well as the enzymes of that pathway, were known to a person of ordinary skill in the art as of the April 22, 2004 filing date. *See, e.g.*, *id.* at Appx9684 (Murphy), Appx8808 (Kunst), Appx9030 (Singh). Sayanova 2004

---

[8] The three relevant pieces of prior art in this case are: (1) Olga V. Sayanova & Johnathan A. Napier, *Eicosapentaenoic acid: biosynthetic routes and the potential for synthesis in transgenic plants*, 65 Phytochemistry 147 (2004) ("Sayanova 2004"), *see* Appx12615-12626; (2) Anthony J. Kinney, et al., *Production of Very Long Chain Polyunsaturated Fatty Acids in Oilseed Plants*, World Intell. Prop. Org., Int'l Pub. No. W02004/071467 (Aug. 26, 2004) ("Kinney 2004"), *see* Appx13068-13199; (3) Frédéric Domergue, et al., *Acyl Carriers Used as Substrates by the Desaturases and Elongases Involved in Very Long-chain Polyunsaturated Fatty Acids Biosynthesis Reconstituted in Yeast*, 278 J. Biological Chemistry 35115 (2003) ("Domergue 2003"), *see* Appx13055-13067.

disclosed that the "conventional" Δ6 LC-PUFA synthesis pathway was "the most obvious" one, and included a table of desaturases and elongases (including a bifunctional desaturase) for use in the pathway. *See* Appx12618, Appx12620, Appx12622; Appx9688-9689, Appx9691, Appx10217 (Kunst). Kinney 2004 used the same Δ6 LC-PUFA synthesis pathway (including a bifunctional elongase) to make DHA in oilseed crops. *See* Appx13141-13142; Appx9679 (Murphy); Appx10213 (Kunst). And Domergue 2003 disclosed a bottleneck problem with respect to the Δ6 LC-PUFA synthesis pathway, along with a solution in the form of the desaturase involved in the specification. *See* Appx13055, Appx13066; Appx9694-9695, Appx9695-9696 (Murphy). Thus, if Appellants are correct that disclosure of a Δ6 pathway in one plant, *Arabidopsis*, sufficiently discloses LC-PUFA synthesis in all plants, including canola, as of the April 22, 2004 filing date, a person of ordinary skill in the art would have been motivated with a reasonable expectation of success to combine three pieces of prior art to arrive at that claimed invention. *See, e.g.*, Appx9676-9677 (Murphy); Appx10206-10207 (Kunst).

Appellees therefore cannot rely on such a broad and all-encompassing characterization of their patents to satisfy the written description requirement and still overcome BASF and Cargill's obviousness challenge.

## II.    APPELLANTS CANNOT BE LIABLE FOR INFRINGEMENT AS A MATTER OF LAW BECAUSE BASF CO-OWNS THE ASSERTED PATENTS.

A party cannot infringe a patent it owns.  *See* 35 U.S.C. § 271(a) (providing that a party "infringes" when it uses the invention "without authority"); *Bd. of Trs. of Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 848 (Fed. Cir. 2009).  The MTEA between BASF and CSIRO confers ownership of the joint products of their collaboration, including intellectual property such as patents, to both parties from the moment they are created.  The terms of that agreement make BASF a co-owner of *all* the asserted patents in this case—including the Group A patents, if they are not invalid, and the Group E patent, if Appellees seek to overturn the jury's finding that it is invalid.  And CSIRO cannot maintain an infringement lawsuit against Cargill involving those patents without BASF as a co-owner, *Roche*, 583 F.3d at 848, which, of course, BASF would not agree to.  It is therefore legally impossible for the Appellants to have infringed.

Patent ownership is governed by underlying property law.  *See Akazawa*, 520 F.3d at 1357.  Here, the MTEA governs the parties' respective ownership interests.  Its meaning is a legal question that this Court reviews de novo.  *See Thatcher*, 397 F.3d at 1374.[9]  Any subsidiary factual issues are reviewed, following Fourth Circuit

---

[9] The MTEA contains a choice-of-law provision that expired at the end of the

practice, "viewing the evidence in the light most favorable to the prevailing party." *Brice*, 220 F.3d at 237.

1. BASF and CSIRO entered into the MTEA in 2008 to "[e]nhance the probability that the combination of BPS and CSIRO genes" would satisfactorily produce fatty acids from canola seed oil. Appx12681. They sought to achieve a "quantum increase in EPA" and to "deliver optimal conversion of EPA to DHA." *Id.* To that end, the parties agreed to "jointly evaluate each party's genes, promoters, and constructs to see if there" were opportunities for improved performance. Appx12665.

Each party approached the deal with a bundle of its own proprietary materials and information. The agreement referred to these pre-existing interests as "Background Technology," *id.*, and Schedule A of the agreement listed some of the most pertinent Background Technology that each party brought to the table, Appx12675-12680. At the same time, the parties anticipated that their collaboration might lead to new technology, materials, and intellectual property. They therefore included a provision addressing "[o]wnership" of any "New Materials, Transformed

---

contract's term in 2010. Appx12673. The District Court did not resolve which jurisdiction's law governs the contract today, *see* Appx6898, but the parties agreed below that there are no material differences of contract law among the possible jurisdictions. Appx14815 n.2.

Lines and Results," Appx12669-12670—and agreed that these arrangements would survive the expiration of the agreement in 2010, Appx12673.

Broadly speaking, the parties agreed that anything newly created through a combination of their efforts or proprietary materials would be jointly owned, and anything created solely from one party's efforts or materials would be owned solely by that party. Appx12669-12670. In its particulars, the agreement subdivides types of property into three categories: "Joint New Materials," "Joint Transformed Lines," and "Joint Results." *Id.* Each of those categories is a defined term. "Joint New Materials" means "constructs contain[ing] both CSIRO and [BASF] genes." Appx12666. "Joint Transformed Lines" are "new transgenic lines developed through the incorporation of" "Joint New Materials" into BASF's existing lines. *Id.* And "Joint Results" refers broadly to "all results, data, or information derived from" "the program[] of work to be carried out under this Agreement" "with respect to Joint Transformed Lines and Joint New Materials." *Id.*

The MTEA provides that all three categories "and any Intellectual Property subsisting in them will be owned, immediately upon creation" "jointly by CSIRO and [BASF]." Appx12669-12670. Putting together these definitions, BASF and CSIRO jointly own any intellectual property based on: (1) constructs containing both CSIRO and BASF genes; (2) "new transgenic lines" incorporating BASF genes; or

(3) results, data, or information derived from their collaboration under the MTEA implicating constructs or lines incorporating BASF and CSIRO genes.

2. The jury determined there was a valid agreement between the parties, and that when its terms are met, the MTEA confers co-ownership on BASF. *See* Appx27. And the jury correctly determined that BASF co-owns the Group B patent. *Id.* The patent's claims indisputably include genes that the MTEA expressly recognizes as BASF's. *Compare* Appx2040 at col. 241:44, 241:47 ('792 patent) (claiming amino acid sequences encoded by nucleotides with "SEQ ID NO: 131" and "130"); Appx1934 at col. 29:11-12 (defining "SEQ ID NO:130: as *Ostreococcus tauri* Δ5 elongase" and "SEQ ID NO:131" as "*Thraustochytrium* sp. Δ5 desaturase"), *with* Appx12678 (recognizing that those two genes belong to BASF).

The jury should have reached the same conclusion with respect to the Group A, D, and E patents. Its contrary verdict cannot be reconciled with the evidence presented at trial. *Each* of these patents is indisputably based in part on materials that BASF brought to the collaboration, and therefore belongs equally to BASF and CSIRO.

Start with the '579 and '033 patents, both in Group A. *See* Appx45. Each of those patents contains a claim incorporating enzymes that the MTEA specifies as belonging to BASF. Both recite a "*Brassica* plant cell comprising," among other things, polynucleotides encoding "a Δ6 elongase which has the amino acid sequence

set forth as SEQ ID NO:31" and "a Δ5 desaturase which has the amino acid sequence set forth as SEQ ID No:18."  *See* Appx1266 at col. 215:54-61, 216:33-36 ('579 patent); Appx1894 at col. 215:47-50, 54-57 ('033 patent).  The cross-referenced amino acid sequences are, respectively, a Δ6 elongase from *Physcomitrella patens* and a Δ5 desaturase from *Thraustochytrium* sp.  Appx1166-1167  at col. 16:62-63, 17:22-23 ('579 patent); Appx1794-1795 at col. 16:60-61, col. 17:20-21 ('033 patent).

According to Schedule A of the MTEA, the recited enzymes are "[g]enes" belonging to BASF.  Appx12678.  That makes the claimed cells Joint New Materials under the MTEA, because they incorporate both BASF and CSIRO genes. Appx12666.  At a minimum, the patents rest on "Joint Results" because they clearly incorporate "data or information" derived from BASF's genes.  *Id.*  The patents are therefore jointly owned by BASF and CSIRO.  Appx12669-12670.

The same is true of the remaining Group A patents, the '880 patent and the '357 patent.  Those patents, too, claim aspects of *BASF's* process for modifying canola to express LC-PUFAs.  *See* Appx1403-1404 at col. 215-218; Appx2176 at col. 217-218.  *BASF* performed all the experiments in canola under the MTEA, Appx9530 (Bauer), and thus shared with CSIRO "construct combinations, gene combinations, construct design," and "how to get these constructs working . . . in canola," Appx9540 (Bauer).  Dr. Singh wrote at the time that the information BASF

51

shared was "substantial" and had "extremely good value." Appx13586. Thus, the District Court found that these patents include "very specific combinations of genes . . . that BASF used in its [LFK regulatory line]." Appx46. Indeed, the parties "stipulated" as much. *Id.* As the District Court explained, it was undisputed that "the asserted Group A patent claims were modified in continuation applications to aim at BASF's LFK seed line." *Id.* In targeting BASF's products, Appellees could not help but rely on BASF's data and information—information that CSIRO's lead inventor, Dr. Singh, admitted allowed CSIRO to see how its genes and BASF's genes "were operating inside of canola." Appx9025 (Singh); *see also* Appx9037-9039 (Dr. Singh admitting that an August 2009 document summarizing "results of the joint evaluation" (Appx13241-13245) had been inserted in Dr. Singh's notebook from 2017, the year CSIRO submitted applications for several of the asserted patents). These patents therefore rest on information that constitutes "Joint Results," making them jointly owned. Appx12669-12670.

The Group D and E patents are likewise jointly owned because they rely on Joint Results.[10] One of the experiments the parties conducted under the MTEA involved assessing the usefulness of combining "omega3-specific Δ6-desaturases

---

[10] This Court need only consider this argument as applied to Group E if it reverses the District Court's determination that the Group E patent is invalid for lack of written description.

and fungal Δ15-desaturases." Appx12682. The parties therefore evaluated several "[c]ombination [BASF]-CSIRO" constructs involving those two categories of enzymes. *Id.*

Both of the Group D and E patents reflect these combinations. The specification of each patent expressly recognizes that such combinations are "particularly advantageous . . . for efficient [LC-PUFA] synthesis." Appx2239 at col. 66:19-26 (Group D patent); *see* Appx2445 at col. 62:38-45 (Group E patent); *see also* Appx2227 at 42:46-50 (Group D patent) (declaring one such combination a "more preferred embodiment"); Appx2434 at col. 40:52-56 (Group E patent) (same). Indeed, the inventors stressed the importance of this combination in a paper they authored together in 2012—several years after the completion of the evaluation under the MTEA. Appx13232; *see also* Appx9907-9908 (Petrie) (acknowledging the combination "helped to increase the omega-3 desaturase concentration in . . . results"). Because the patents plainly incorporated results of the MTEA evaluation of this combination of desaturases, the MTEA specifies they are jointly owned. *See* Appx12669-12670.

3. In denying the Appellants' motion for judgment as a matter of law, the District Court did not identify any particular evidence supporting the jury's verdict. *See* Appx153-154. Instead, the court stated that the jury might have concluded one of two things: either that "nothing jointly developed or confidentially obtained . . .

is claimed in any of the patents-in-suit," or that "all of the witnesses with personal knowledge of the work developed under the MTEA or the information exchanged during the MTEA testified that CSIRO never used any" Joint Results or Joint New Materials in formulating the patents.    Appx154 (internal quotation marks and emphasis omitted).    Neither is legally relevant to the ownership question.

a.    It is irrelevant under the MTEA's ownership provision whether the information or materials that the patent is based on are confidential.    The contract addresses confidentiality in a separate provision.    *Compare* MTEA § 6, Appx12669-12670, *with* MTEA § 8, Appx12671.    The "Ownership" section is indifferent about whether something is confidential.    It turns on whether the relevant materials or information belong to BASF or CSIRO according to the definitions provisions and Schedule A.    *See* Appx12669-12670.    The definitions and Schedule A likewise do not look to whether information is confidential in evaluating ownership.    *See* Appx12666, Appx12675-12677.    The fact that the Agreement specifically contemplates ownership of "Intellectual Property" further confirms that it reaches non-confidential property—after all, patents and other intellectual property are, by their nature, public.    *Cf. Pfaff*, 525 U.S. at 63.

It is likewise irrelevant whether the patents expressly *claim* Joint New Materials, Joint Transformed Lines, or Joint Results.    The ownership provision is broader than what's claimed, extending to any intellectual property that "subsist[s]

in" Joint New Materials or Joint Results.  Appx12669.  Intellectual property can "subsist in" certain data or information without appearing on its face.  *See Subsist, v.*, Oxford English Dictionary (3d ed. 2012) ("to inhere or exist in a particular substance or other thing").[11]    It is equally irrelevant whether the parties "jointly developed" the patents themselves.  The MTEA looks to who owns the *materials* and *information* to assign ownership, not who had a direct hand in its creation.  *See* Appx12669-12670.[12]

Finally, it makes no difference whether CSIRO's witnesses subjectively *believe* they relied on Joint New Materials or Joint Results.  The question is whether they actually *did* within the meaning of the terms of the MTEA.  And despite their conclusory claims, *see* Appx9028, Appx9114 (Singh); Appx9187-9189 (Adler), CSIRO's witnesses did not deny relying on the specific materials and information

---

[11] In any event, the Group A '579 and '033 patents *do* claim specific genes that the MTEA lists as belonging to BASF.  *Supra* pp. 50-51.

[12] At trial, Appellees repeatedly suggested that CSIRO had an exclusive ownership interest in the Group A patents based on the 2004 priority application, which the MTEA lists as CSIRO's.  *See* Appx9574 (Bauer); Appx10412 (CSIRO closing argument).  That argument was wrong and misleading, as the asserted Group A patents are *not* listed as pre-existing property in the MTEA given that CSIRO did not apply for those patents until years after the MTEA joint evaluation concluded.  During post-trial motions, CSIRO apparently recognized as much:  It dropped this line of argument and used the 2004 application only to bolster its contention that the Group A patents involved public information.  *See* Appx14960 n.10.

discussed above.  Under the terms of the contract, that use is sufficient to make BASF a co-owner of all the asserted patents.

The judgment of infringement should therefore be reversed.

## III.    CARGILL SHOULD BE DISMISSED FROM THIS LITIGATION[13]

There is yet a separate reason the liability finding as to Cargill must be set aside: The District Court erred in finding venue over Cargill.  "Federal Circuit law, rather than regional circuit law, governs [the] analysis of what § 1400(b) requires." *In re Cray Inc.*, 871 F.3d 1355, 1360 (Fed. Cir. 2017).  Under the patent venue statute, an action for patent infringement may be brought against Cargill only (1) where it resides, or (2) where it has committed acts of infringement and has a regular and established place of business.  *See* 28 U.S.C. § 1400(b); *TC Heartland*, 137 S. Ct. at 1517.  Neither prong is satisfied here.

Cargill is a Delaware corporation with its principal place of business in Minnesota.  Appx3637.  The canola field trials Cargill conducted in support of BASF's deregulatory petition were done in Texas, Georgia, Louisiana, Iowa, Minnesota, North Dakota, Montana, Washington, and South Dakota.  Appx3611. Cargill has never cultivated, planted, grown, harvested, processed, extracted, or commercialized any omega-3 canola seeds or oil in Virginia.  Appx3638; *see also* Appx9451-9452 (Christiansen).  Neither has Cargill conducted any research or

---

[13] BASF does not join this portion of the brief.

development on transgenic canola in Virginia, Appx3612; the research and development work related to this project was done in Fort Collins, Colorado. Finally, Cargill has not sold, offered to sell, marketed or advertised the sale of omega-3 canola seeds or oil in Virginia. Appx3639. In short, there is no plausible argument to be made that Cargill resides in Virginia, or that it committed an act of infringement in Virginia. *Valeant Pharms.*, 978 F.3d at 1375.

At the district court, Appellees bore the burden to show proper venue. *In re ZTE (USA) Inc.*, 890 F.3d 1008, 1013-14 (Fed. Cir. 2018). They alleged Cargill committed an act of infringement by inducing BASF to deposit seeds at the ATCC in Virginia, and further by making plans to market the seeds in Virginia. Appx2900, Appx2942, Appx2946, Appx2950, Appx2954, Appx2958, Appx2962-2963, Appx2966; Appx6894. The District Court agreed with the first argument, concluding that "depositing those seeds as a necessary means to monetize such seeds would appear to at least be 'use'" under § 271(a). Appx6894-6895. In so doing it entirely disregarded the fact that it was BASF, *not Cargill*, that filed the patent application and deposited the seeds, relying on *Minnesota Mining & Mfg. Co. v. Eco Chem, Inc.*, 757 F.2d 1256, 1265 (Fed. Cir. 1985), for the proposition that acts of one corporation can be attributable to another for purposes of venue under the patent statute. Appx6895.

That was legal error. The deposit of seed samples with the ATCC was hardly "a necessary means to monetize" the seeds, *id.*; rather, it was done in furtherance of BASF's patent applications, Appx2758-2759; Appx9309 (Andre). Cargill never deposited seeds, never directed BASF to do so, and had no authority to direct BASF to do so. Appx3639. In fact, it did not even know that BASF was depositing the seeds. *Id.* Thus, Cargill did not induce BASF to do anything, much less induce infringement under 35 U.S.C. § 271(b). *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1332 (Fed. Cir. 2016) (inducement requires "an affirmative act to encourage infringement with the knowledge that the induced acts constitute patent infringement" (internal quotation marks omitted)). Here, there is not even an allegation that Cargill took steps to encourage BASF to infringe the CSIRO patents and, without knowledge that the act was going to occur and that it would infringe CSIRO's patents, there can be no induced infringement. *Id.* at 1331 (The term "induce" as used in § 271(b) "requires successful communication between the alleged inducer and the third-party direct infringer.").

Moreover, Cargill is not an owner or assignee of the patent applications, so Cargill received no benefit related to the seed deposit. For this reason, Cargill's relationship to BASF is decidedly different from the "intimately connected" parties in the 35-year-old, pre-*TC Heartland* case the District Court found persuasive. *See Minnesota Mining & Mfg. Co.*, 757 F.2d at 1265 (concluding that piercing the

58

corporate veil is appropriate in order to establish venue under the patent venue statute). Even if the District Court had been right about the relationship between Cargill and BASF—it was not—the *Minnesota Mining & Manufacturing Co.* case is dubious precedent upon which to rely after *TC Heartland* and its progeny. *See, e.g.*, *Valeant Pharms.,* 978 F.3d at 1380 ("[C]ourts should be mindful of the specific and unambiguous nature of venue in applying the statute and be careful not to conflate showings that may be sufficient for other purposes, e.g., personal jurisdiction or the general venue statute, with the necessary showing to establish proper venue in patent cases." (internal quotation marks and brackets omitted)).

There has been no basis since the pleading stage for the District Court to conclude Cargill committed an act of infringement within Virginia sufficient to confer venue. The judgment entered against Cargill therefore should be vacated. *See In re HTC Corp.*, 889 F.3d at 1353.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court should be reversed with respect to the validity of the Group A patents and the enforceability of the Group A and D patents, and judgment should be entered for the Appellants on those claims. In addition, the finding of liability as to Cargill should be vacated because venue was lacking.

Respectfully submitted,

/s/ Catherine E. Stetson

Ahmed J. Davis
Daniel R. Gopenko
FISH & RICHARDSON P.C.
1000 Maine Avenue, S.W.
Suite 1000
Washington, D.C. 20024
(202) 783-5070

Catherine E. Stetson
Anna Kurian Shaw
Reedy C. Swanson
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
cate.stetson@hoganlovells.com

Christopher R. Dillon
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA  02210-1878
(617) 542-5070

Jason Leonard
Nitya Anand
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000

Elizabeth M. Flanagan
FISH & RICHARDSON P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN  55402
(612) 335-5070

*Counsel for Appellants BASF Plant Science, LP and BASF Plant Science, GmbH*

*Counsel for Appellant Cargill, Incorporated*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 21, 2020, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

/s/ Catherine E. Stetson
Catherine E. Stetson

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that this brief contains 13,397 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(b).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been has been prepared in Times New Roman 14-point font using Microsoft Word 2010.

/s/ Catherine E. Stetson
Catherine E. Stetson